IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PLS IV, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 2:24-CV-00466-JRG |
| | § | |
| GDC TECHNOLOGY LIMITED, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM CLAIM CONSTRUCTION OPINION AND ORDER

In this patent case, Plaintiff PLS IV, LLC ("PLS") accuses Defendant GDC Technology Limited ("GDC") of infringing claims of U.S. Patent No. 7,340,602 (the "'602 Patent") and U.S. Patent No. 7,406,603 (the "'603 Patent"). The '602 Patent "relates to systems and methods for authenticating and protecting the integrity of electronic information using cryptographic techniques." '602 Patent at 1:40–41. The '603 Patent concerns data protection systems and methods that "provide enhanced resistance to attempts to circumvent content protection." '603 Patent at [54], 1:27–29.

The parties present four claim-construction disputes from the two patents. Having considered the parties' briefing, along with arguments of counsel at a November 10, 2025 hearing, the Court resolves those disputes as follows.

### I.   BACKGROUND

#### A.   U.S. Patent 7,340,602

The '602 Patent notes the problem of, in the context of conducting remote transactions, "authenticating messages received from others and providing ways for others to authenticate one's own messages." '602 Patent at 1:51–53. Generally, prior-art techniques for addressing this problem

rely on sharing private information, like a private key, between the sender and receiver of messages. *Id.* at 1:65–2:6. As shown in Figure 1A (below), for example, a message sender applies a hashing algorithm (102) to a message (100), which creates a hash (104) of the message. That hash is encrypted (106) using a private key (108), which results in a separate signature (105). Both the message and the signature are sent to the receiver. As shown in Figure 1B (below), after receiving the message (100') and signature (105'), the receiver decrypts the signature using a public key (118), applies the hashing algorithm to the message (114), and compares the two results (116, 120). If those results are equal, the message is deemed authentic. *See generally id.* at 2:15–36.



**FIGS. 1A (left) and 1B of the '602 Patent**

This approach, however, requires the receiver to receive the entire message before authenticating it. '602 Patent at 2:37–39. For large files, like multimedia files, that can take an impractical amount of time and storage, and might prevent users from starting to use the file before it is completely received. *Id.* at 2:39–47. Alternatively, the file could be broken into parts and the method

shown in Figures 1A–1B used for each subpart, but that can lead to other problems, like receiving parts in an incorrect order. *Id.* at 3:2–5.

As an improvement, the patent teaches "using a signed chain of check values . . . constructed from the original content of the communication." '602 Patent at [57]. "[E]ach check value in the chain [is] at least partially dependent on the signed root of the chain and a portion of the communication." *Id.* In Figure 10A, for example, the disclosed embodiment partitions a content file (1005) into segments $P_1$ through $P_i$. The method hashes each segment, and then hashes each group of hashes, and so on, ultimately obtaining a top-level group hash H(GM) (1020) for the file. This provides a signed hash usable to verify other hash values in the hierarchy, and those other hash values can be used to efficiently authenticate other parts of the file. *See generally id.* at 14:39–15:10.



FIG. 10A



FIG. 10B

The parties dispute one term from this patent, which is a phrase in Claim 25:

> 25. A method for encoding a block of data in a manner designed to facilitate fault-tolerant authentication comprising:
>
> generating a progression of check values, each check value in the progression being derived from a portion of the block of data and from at least one other check value in the progression;
>
> generating an encoded block of data, comprising:
>
> inserting error-check values into the block of data, each error-check value being inserted in proximity to a portion of the block of data to which it corresponds, and each error-check value being operable to facilitate authentication of a portion of the block of data and of a check value in the progression of check values;
>
> transmitting the encoded block of data and the check values to a user's system,

> **whereby the user's system is able to receive and authenticate portions of the encoded block of data before the entire encoded block of data is received**,
>
> wherein each error-check value comprises a hash of the portion of the block of data to which it corresponds.

'602 Patent at 23:38–59 (disputed phrase in bold). Specifically, they dispute whether the "whereby" clause is limiting.

### B.     U.S. Patent 7,406,603

The '603 Patent relates to data protection systems and methods that "provide enhanced resistance to attempts to circumvent content protection." '603 Patent at [54] ("Data Protection Systems and Methods"), 1:27–29. At the time, conventional content protection methods focused on protecting the content during transfer, rather than after removing the content protection for use. *Id.* at 1:34–53. As an example, the patent describes the possibility of "substitut[ing] a malicious software driver to intercept the content file as it is headed for an output device," which "might reroute and/or duplicate the unprotected content file" and "allow[] the attacker to obtain a perfect digital copy of the content and/or to use the content in an unauthorized manner." *Id.* at 1:65–2:3.

The patent describes the invention generally as "using a combination of encryption, watermark screening, detection of invalid content processing software and hardware, and/or detection of invalid content flows" to protect content from packaging until use by the end user. '603 Patent at [57].

> Encryption protects the secrecy of content while it is being transferred or stored. Watermark screening protects against the unauthorized use of content . . . by invoking a filter module to examine content for the presence of a watermark before the content is delivered to output hardware or software. The filter module [prevents] delivery of the content to the output hardware or software if it detects a predefined protection mark. Invalid content processing software is detected by a monitoring mechanism that validates the software involved in processing protected electronic

5

> content. Invalid content flows can be detected by scanning the information passed across system interfaces for the attempted transfer of bit patterns that were released from an application and/or a piece of content management software.

*Id.*

The parties' disputes from this patent relate to the "invalid content flow" part of the invention. Under a section entitled "policy-based validation," the patent explains:

> [A]dditional markings may be added to the content stream in order to allow instrumentation of the general driver stack for the storage medium, or another port capable of streaming the content, . . . to determine if the content is being directed through an unapproved streaming channel. Similarly, if the rules associated with the content allow the content to be presented only on screen (e.g. "view"), or to be played only through an audio device (e.g., "play"), then the detection and monitoring system need only set-up processes which [inspect] the channels appropriate to detecting attacks against those functions (e.g. storing content for later playback, directing it through a substitute module or redirected interface to defeat the protection mechanisms, etc.).

'603 Patent at 19:24–37.

The parties have three disputes from Claim 1, which recites:

> 1. A method for protecting electronic media content from unauthorized use by a user of a computer system, the method including:
>
>> receiving a request from a user of the computer system to use a piece of electronic media content;
>>
>> identifying one or more software modules responsible for processing the piece of electronic media content and enabling use of the piece of electronic media content by the user;
>>
>> processing at least a portion of said piece of electronic media content using at least one of the one or more software modules;
>>
>> evaluating whether the at least one of the one or more software modules process the portion of the electronic media content in an authorized manner, the evaluating including at least one action selected from the group consisting of:

> > evaluating whether the at least one of the one or more software modules make calls to certain system interfaces;
> >
> > evaluating whether the at least one of the one or more software modules direct data to **certain channels**;
> >
> > analyzing dynamic timing characteristics of the at least one of the one or more software modules for anomalous timing characteristics indicative of invalid or malicious activity;
> >
> > **denying the request to use the piece of electronic media content if the evaluation indicates that the at least one of the one or more software modules fail to satisfy a set of predefined criteria.**

'603 Patent at 23:46–24:8 (disputed terms in bold). Specifically, the parties dispute the scope of "certain channels" and "predefined criteria," as well as the effect of the conditional language in the last limitation.

## II.     LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every

claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning

8

of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party addresses the level of ordinary skill in the art at the time of the inventions. For its analysis, the Court finds a skilled artisan at the time of invention would have had a Bachelor of Science in electrical engineering, computer science, or similar field and two years of experience in the field of data encryption and authentication.

## IV. THE DISPUTED TERMS

### A. "whereby the user's system is able to receive and authenticate portions of the encoded block of data before the entire encoded block of data is received" ('602 Patent, Claim 25)

| PLS's Construction | GDC's Construction |
| --- | --- |
| Clause is not limiting. If limiting, plain and ordinary meaning. | Clause is limiting; plain and ordinary meaning. |

Claim 25 recites:

> generating an encoded block of data . . .
>
> transmitting the encoded block of data and the check values to a user's system,
>
> **whereby the user's system is able to receive and authenticate**

9

> **portions of the encoded block of data before the entire encoded block of data is received**,
>
> wherein each error-check value comprises a hash of the portion of the block of data to which it corresponds.

'602 Patent at 23:45–59 (emphasis added). The parties dispute whether the "whereby" clause is limiting.

GDC says the clause is limiting because it is material to patentability. Dkt. No. 49 at 6. In its view, the "whereby" clause "is integral to the 'on-the-fly' authentication discussed in the specification," and "is more than the intended result of other method steps positively recited." *Id.* at 8. Without the "whereby" clause, says GDC, "the required operability of the error-check values is lost." *Id.* at 9. GDC does *not* assert that the receiving and authenticating capabilities of the "whereby" clause must be performed, but only that the user system must be capable of receiving and authenticating as recited in the limitation.

PLS focuses on the general rule that "whereby" clauses in method claims are not given weight when they recite the intended result of a process step. Dkt. No. 47 at 5 (citing cases). Here, says PLS, "the 'whereby' clause merely expresses what the receiving user's system 'is able to' do as a consequence of the specific claim steps that precede it." *Id.* at 6. Nor does PLS consider the clause material to patentability, because "the intended benefit a receiving system may realize when *authenticating* data has no bearing on the patentability of a method of *encoding* that data performed by a different system." *Id.* at 8. Notably, PLS says "the 'whereby' clause only requires the user's system to be '***able to***' receive and authenticate portions of the encoded data block before receiving the entire block of data." *Id.* at 7.

"A whereby clause in a method claim is not given weight when it simply expresses the intended result of a process step positively recited." *Minton v. NASD, Inc.*, 336 F.3d 1373, 1381

(Fed. Cir. 2003) (citing *Tex. Instruments Inc. v. United States ITC*, 988 F.2d 1165, 1172 (Fed. Cir. 1993)). Concluding the "whereby" clause at issue was not limiting, the *Minton* court reasoned the clause "on its face does not inform the mechanics of how the trade is executed, and nothing in the specification or the prosecution history suggests otherwise." *Id.* at 1381. But in *Hoffer v. Microsoft Corp.*, 405 F.3d 1326 (Fed. Cir. 2005), the court, while acknowledging *Minton*'s general rule, stressed that "when the 'whereby' clause states a condition that is material to patentability, it cannot be ignored [to] change the substance of the invention." *Hoffer*, 405 F.3d at 1329. In *Hoffer*, the court held the clause limiting because it was "more than the intended result of a process step; it is a part of the process [itself]." *Id.* at 1330 (concluding the limitation in question "is described in the specification and prosecution history as an integral part of the invention").

Here, the "whereby" clause is limiting. One cannot read the limitation as the *result* of the previously recited steps, so the general rule does not apply. Nor does the limitation, as PLS asserts, "merely express[] what the receiving user's system 'is able to' do *as a consequence of*" those steps. Rather, the claim language clearly describes a *capability* of the user's system. Notably, although the claim's preamble recites a method of "encoding a block of data in a [specific] manner," the applicant chose to also include a transmitting step and limit the characteristics of the receiving system to one "able to receive and authenticate portions of the encoded block of data before the entire encoded block of data is received." Based on the plain language of the claim, the Court holds the "whereby" clause requires the user's system to have that recited capability.

**B.    "certain channels" ('603 Patent, Claim 1)**

| PLS's Construction | GDC's Construction |
|---|---|
| Plain and ordinary meaning. | "unapproved channels" |

Claim 1 recites:

> receiving a request from a user of [a] computer system to use a piece of electronic media content;
>
> . . .
>
> evaluating whether the at least one of the one or more software modules process the portion of the electronic media content in an authorized manner, the evaluating including at least one action selected from the group consisting of:
>
> > evaluating whether the at least one of the one or more software modules make calls to certain system interfaces;
> >
> > evaluating whether the at least one of the one or more software modules direct data to **certain channels**;
> >
> > analyzing dynamic timing characteristics of the at least one of the one or more software modules for anomalous timing characteristics indicative of invalid or malicious activity . . . .

'603 Patent at 23:49–24:4 (emphasis added). Following the "evaluation" using one of the three "actions," the method "den[ies] the request to use the piece of electronic media content if the evaluation indicates that the at least one of the one or more software modules fail to satisfy a set of predefined criteria." *Id.* at 24:5–8.

The parties dispute the scope of "certain channels" in the second evaluating "action" and, more specifically, whether that term should be limited to "unapproved channels." GDC asserts "a broader construction encompassing more than unapproved channels would render the claimed method ineffective and create indefiniteness issues." Dkt. No. 49 at 13. In that case, "the claim would sweep in legitimate, policy-compliant uses and fail to achieve its stated purpose of 'protecting . . . from unauthorized use.'" *Id.* Moreover, says GDC, the patent describes "certain channels" only in embodiments aimed at detecting and blocking unauthorized data use. *Id.* at 13–14. Finally, if "certain channels" includes both unapproved and approved channels, the term is subjective and standardless, and therefore indefinite. *Id.* at 14–15.

12

Citing dictionary definitions for "certain," PLS says GDC's construction "would improperly read in a restriction not found in the plain meaning" of the term. Dkt. No. 47 at 12. It says GDC's construction would contradict the first part of the limitation, which recites "evaluating whether the . . . software modules process . . . the electronic media content in an authorized manner," and the last limitation, which denies the request if the evaluation indicates specified criteria aren't met. *Id.* at 13. PLS also stresses the specification's disclosure of embodiments in which the evaluation concerns approved channels. *Id.* at 13–14 (citing excerpts from the specification).

The Court agrees with PLS. For one, nothing about the ordinary meaning of "certain" limits the channels to only *unauthorized* channels. Thus, to impose such a narrowing construction, GDC must show some disclaimer or lexicography, which it fails to do. In fact, it doesn't try, instead asserting its construction is simply the proper construction of the term considering the intrinsic record. Dkt. No. 49 at 14. But this is not a case of choosing one meaning from multiple plausible meanings based on which best aligns with the disclosure. Rather, the applicant chose not to limit the channels to only those that are unauthorized. *See Retractable Techs. v. Becton, Dickinson & Co.*, 659 F.3d 1369, 1371 (Fed. Cir. 2011) ("It is not for the court to tailor the claim language to the invention disclosed. The language is the language . . . .").

Nor is GDC's "indefiniteness" argument persuasive. "Certain channels" are merely channels that are "definitively known, fixed, or settled," without regard to whether they are unauthorized. *See certain*, Encarta World English Dictionary (1999), Dkt. No. 47-8 at 299; *certain*, Random House Webster's College Dictionary (2005), Dkt. No. 47-12 at 200. GDC, however, does not explain with any depth why the term is subjective and standardless if its scope includes both authorized and unauthorized channels.

GDC also argues the claimed process doesn't work if the "certain channels" are authorized,

13

but that ignores the "denying" step and the first part of the "evaluating" step. Regarding the former, the "predefined criteria" determine whether the request is authorized. If those "predefined criteria" are not satisfied, the request is denied. Moreover, the "evaluating" step doesn't just require *any* type of evaluation, but "evaluating whether the . . . software modules process the portion of the electronic media content *in an authorized manner*." '603 Patent at 23:58–60 (emphasis added). In fact, the "evaluating" step is necessary to decide whether the "certain channels" are authorized. If that was already known, there would be no need for the "evaluation."

Finally, GDC asserts its construction would limit the term to the '603 Patent's *intended* scope as set forth in the specification. Dkt. No. 49 at 15. But the claims, not the specification, define the scope of protection. *Aventis Pharm.*, 715 F.3d at 1373 (noting courts must "look to the words of the claims themselves . . . to define the scope of the patented invention" (citations omitted)). In any event, courts don't try to discern *intended* claim scope, but only how a skilled artisan would understand the claim language in light of the specification. Here, such a person would not understand "certain" to have the narrow meaning urged by GDC for the reasons stated above. Accordingly, the Court rejects that construction and will give "certain channels" a "plain and ordinary meaning" construction.

C. **"software modules fail to satisfy a set of predefined criteria" ('603 Patent, Claim 1)**

| PLS's Construction | GDC's Construction |
|---|---|
| Plain and ordinary meaning | "software modules processing electronic media content in a manner predefined as unapproved" |

This is a similar dispute to the dispute about "certain channels." Claim 1's last limitation recites:

> denying the request to use the piece of electronic media content

> if the evaluation indicates that the at least one of the one or more software modules fail to satisfy a set of **predefined criteria**.

'603 Patent at 24:5–8 (emphasis added).

The parties dispute whether the "predefined criteria" must be limited to "criteria" indicating that the authorization is not approved. GDC says that "[i]n every embodiment, failing to meet the criteria triggers denial of the requested use because the processing is unapproved under the content security policy." Dkt. No. 49 at 16. According to PLS, the surrounding claim language supports the terms "neutral plain meaning," and GDC's construction would exclude embodiments. Dkt. No. 47 at 16.

The Court agrees with PLS. Regardless of the criteria, under the claim's plain language, if the evaluation indicates the software modules fail to satisfy them, the method denies the user's request to use the content, which itself means the use is not authorized. The "predefined criteria" does not need to separately specify whether the criteria is for authorized or unauthorized access. The Court will give this term a "plain and ordinary meaning" construction.

> D. **"denying the request to use the piece of electronic media content if the evaluation indicates that the at least one of the one or more software modules fail to satisfy a set of predefined criteria" ('603 Patent, Claim 1)**

| PLS's Construction | GDC's Construction |
|---|---|
| Contingent claim step; plain and ordinary meaning. | Plain and ordinary meaning; the scope of the claim is limited to methods where the condition is met, and the step is performed. |

This dispute concerns the same limitation at issue in the previous dispute, which recites:

> denying the request to use the piece of electronic media content if the evaluation indicates that the at least one of the one or more software modules fail to satisfy a set of predefined criteria.

15

'603 Patent at 24:5–8. Specifically, the dispute centers on the conditional nature of the limitation.

GDC says the scope of the claim is limited to implementations that both (1) indicate the software modules "fail to satisfy a set of predefined criteria," and (2) perform the "denying" step. Dkt. No. 49 at 18. PLS replies that a system implementing the method is within the limitation's scope "so long as the system performing the method has the *capability* of performing the contingent step if the condition [is] satisfied." Dkt. No. 50 at 7.

Of the cases cited by the parties, *Cybersettle v. Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. App'x 603 (Fed. Cir. 2007), addresses claim language most like the disputed phrase. In *Cybersettle*, the patent at issue concerned a "computerized dispute resolution system and method." 243 Fed. App'x at 604. The court described the invention as a method that "automates dispute resolution through a computerized system that receives [litigants'] proposals (or 'bids') for settling a claim, keeps the bids confidential, and determines whether, according to preset standards, the bids are close enough to result in settlement of the claim." *Id.* Claim 27 recited "testing a pair of non-equal values in one of at least two rounds" and "if the pair of bids meets the established settlement condition, calculating a settlement value for the claim." *Id.* at 605. Resolving a dispute unrelated to Claim 27, the court explained "[i]t is of course true that method steps may be contingent. If the condition for performing a contingent step is not satisfied, the performance recited by the step need not be carried out in order for the claimed method to be performed." *Id.* at 607.

GDC criticizes *Cybersettle* as non-precedential and questioned by later precedential cases. Specifically, GDC suggests the court in *Hytera Commnc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210 (Fed. Cir. 2021), opted not to follow *Cybersettle*, and that *Lincoln Nat'l Life Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364 (Fed. Cir. 2010), contradicts *Cybersettle*. Dkt. No. 49 at 20. Both cases, however, are distinguishable.

16

In *Hytera*, Claim 7 recited two alternative conditions and corresponding responses:

> *if* the timeslot is the current desired timeslot, selecting a synchronization pattern selected from the first set of synchronization patterns based on the one of the particular payload type and a particular source of the transmission;
>
> *otherwise* selecting a synchronization pattern selected from the second set of synchronization patterns based on the one of the particular payload type and the particular source of the transmission;

*Hytera*, 841 F. App'x at 215 (emphasis by the court). Hytera challenged the Patent Trial and Appeal Board's conclusion in an *inter partes* review proceeding that the prior art must teach both cases to render the claim obvious or anticipated. *Id.* at 214. The court affirmed the Board's conclusion, explaining "the 'selecting' step in claim 7 is not met unless the . . . system is configured to perform each claimed responsive action in response to each corresponding claimed prerequisite condition." *Id.* at 216. GDC says *Hytera* questioned *Cybersettle*, but the court didn't question the rule—only the applicability of the rule to the claim at issue. *Id.* (noting *Cybersettle* is distinguishable because the limitation at issue "requires that a specific action be taken in response to each of two alternative specified conditions").

In *Lincoln*, the patent concerned "computerized methods for administering variable annuity plans." *Lincoln*, 609 F.3d at 1366. The limitation in question recited "periodically paying the scheduled payment to the owner [of a variable annuity plan having a guaranteed minimum payment feature] for the period of benefit payments, *even if the account value is exhausted before all payments have been made*." *Id. Lincoln*'s "even if" language is distinguishable from the disputed term because it did not recite a conditional limitation. If anything, the language clarified there was *not* a condition that the payments must only be made if the account was *not* exhausted.

Notably, GDC's interpretation of the limitation would render the "condition" superfluous.

17

In other words, if the "denying" must always be performed, there's no point to conditioning it on an indication from the "evaluation" step. Applying *Cybersettle*'s rule, however, avoids that problem and comports with the plain language of the limitation. Accordingly, the Court holds that rule applies to this limitation, and "denying the request" need only be performed if the evaluation indicates that the at least one of the one or more software modules fails to satisfy a set of predefined criteria.

V.   CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "whereby the user's system is able to receive and authenticate portions of the encoded block of data before the entire encoded block of data is received" <br> ('602 Patent, Claim 25) | The "whereby" requires the user's system to have the recited capability, but does not require actually receiving and authentication. |
| "certain channels" <br> ('603 Patent, Claim 1) | Plain and ordinary meaning |
| "software modules fail to satisfy a set of predefined criteria" <br> ('603 Patent, Claim 1) | Plain and ordinary meaning |
| "denying the request to use the piece of electronic media content if the evaluation indicates that the at least one of the one or more software modules fail to satisfy a set of predefined criteria" <br> ('603 Patent, Claim 1) | If the evaluation does not indicate that the at least one of the one or more software modules fail to satisfy a set of predefined criteria, the "denying" need not be performed. |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that

contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**So ORDERED and SIGNED this 24th day of November, 2025.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE