IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PLS IV, LLC, a Delaware LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>GDC Technology Limited, a foreign company,<br><br>    Defendant. | Civil Action No. 2:24-cv-00466-JRG<br><br>REDACTED |

**GDC TECHNOLOGY LIMITED'S *CORRECTED* MOTION TO EXCLUDE AND
STRIKE EXPERT TESTIMONY OF STEPHEN E. DELL**

**TABLE OF CONTENTS**

I.     LEGAL STANDARD.................................................................................................. 2

II.    SUMMARY OF DELL'S DAMAGES OPINIONS............................................... 3

III.   DELL'S DAMAGES OPINION IS NOT BASED ON RELIABLE METHODOLGY ........ 4

       A.     Dell's Heavy Reliance On a Litigation Settlement Agreement as Primary
              Benchmark Without Any Adjustment is an Unreliable Methodology.................... 4

       B.     Dell Fails to Properly Apportion the Royalty Rate to the Alleged Inventions ....... 5

       C.     Dell's Exclusion of Other Data Points Illustrate the Unreliability of His Reliance
              on the AMC Settlement ..................................................................................... 8

       D.     Dell Fails To Account For the Different Economic Roles of Exhibitors and
              Manufacturers ................................................................................................. 10

       E.     Dell's Upward Adjustments From ▮▮▮▮▮▮▮▮ are Arbitrary and Not
              Grounded in Any Reproducible Methodology .................................................... 12

       F.     Dell's Royalty Base is Overinclusive and Relies On Unverified Assumptions ... 13

       G.     Dell Makes No Adjustment to the AMC/Cinemark Rate in View of the Different
              Damages Theory Intertrust Asserted In That Case .............................................. 14

IV.    CONCLUSION....................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015)................................................................................................ 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993).................................................................................................................. 1, 2

*EcoFactor, Inc. v. Google LLC*,
   137 F.4th 1333 (Fed. Cir. 2025) ............................................................................................. 5

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)............................................................................................... 2, 7, 8

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018)............................................................................................... 7

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)............................................................................................... 11

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)................................................................................................................. 12

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
   707 F. Supp. 3d 309 (S.D.N.Y. 2023)..................................................................................... 9

*Jiaxing Super Lighting Elec. Appliance, Co. v. CH Lighting Tech. Co., Ltd*,
   146 F.4th 1098 (Fed. Cir. 2025) ............................................................................................. 6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51(Fed. Cir. 2012).................................................................................................... 2, 5, 8

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)............................................................................................... 2

*Packet Intel. LLC v. NetScout Sys., Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020)............................................................................................... 13

*Prism Techs., LLC v. Sprint Spectrum, L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017)............................................................................................... 2

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010).................................................................................................. 2, 9

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
  156 F.4th 1289 (Fed. Cir. 2025) ................................................................................ 6

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
  754 F.2d 345 (Fed. Cir. 1985)................................................................................. 14

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015)................................................................................. 2

**Rules**

Fed. R. Evid. 702 ................................................................................................... 1, 2

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | Expert Report of Stephen E. Dell, CVA Relating to Damages ("DR"), dated December 20, 2025 |
| B | Deposition of Stephen E. Dell, dated January 20, 2026 ("DT") (excerpted) |
| C | Settlement and License Agreement between Intertrust Technologies Corporation, Cinemark Holdings, Inc., and AMC Entertainment Holdings, Inc. ("AMC Settlement"), dated ▇▇▇▇▇▇▇ |
| D | Complaint, *Intertrust Technologies Corporation, v. Cinemark Holdings, Inc.*, Civil Action 2:19-cv-00266-JRG, Dkt. No. 1 (E. D. Tex. Aug. 7, 2019) (excerpted) |
| E | Digital Cinema Royalty Discussions, February 2019  ("DCRD") (excerpted) |
| F | Deposition of Dr. Man-Nang Chong, dated December 3,2025 (excerpted) |
| G | Patent Purchase Agreement between Intertrust Technologies Corporation and PLS IV, LLC ("PPA"), dated ▇▇▇▇▇▇▇▇▇▇ (excerpted) |
| H | Press Release: AMC Entertainment Holdings, Inc. Completes Acquisition of Starplex Cinemas ("Press Release"), dated December 15, 2015 (excerpted) |
| I | Intertrust's Opposition to Defendants' Motion to Strike Portions of Expert Report and Exclude Certain Opinions and Testimony of Mr. David Yurkerwich, ("Opp.") (redacted), *Intertrust Technologies Corporation v. Cinemark Holdings, Inc.*, *AMC Entertainment Holdings, Inc.*, Civil Action 2:19-cv-00266-JRG, Dkt. No. 296 (E. D. Tex. Aug. 7, 2019) (excerpted) |

Defendant GDC Technology Limited ("GDC") moves to exclude the expert testimony and strike the report of Plaintiff's damages expert, Stephen E. Dell ("Dell"), under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. PLS IV, LLC ("PLS") alleges GDC's media blocks, when used by exhibitors to show DCI compliant digital media content, infringe U.S. Patent No. 7,340,602 ("the '602 patent") and U.S. Patent No.7,406,603 ("the '603 patent") (collectively, "the asserted patents") and that GDC has actively induced or contributed to their infringement. PLS served the Expert Report of Stephen E. Dell, CVA, Relating to Damages ("DR") on GDC, attached as Exhibit A. However, as set forth in Dell's report and his testimony during his January 20, 2026 deposition[1] ("DT"), Dell's ██████ ██████ damages opinion is not the product of reliable principles and methods. It is driven almost entirely by a single litigation settlement agreement, selectively uses or fails to use similar licensing evidence, fails to genuinely apportion to the patents-in-suit, relies on arbitrary upward adjustments, and applies an inflated, unverified royalty base.

Dell starts with a nominal ██████████████ not <u>media block</u>, "rate" from the AMC Settlement,[2] labels it "fully apportioned" to the asserted patents, increases it via an arbitrary 3



per media block. Dell also does not bother to do basic financial analysis such as a time-value-of-money adjustment of the █████ from the 2022 AMC Settlement to the 2011 date of the hypothetical negotiation he selected. He makes no attempt to apportion between ████████ in the AMC

---

[1] Excerpts of Dell's transcript are attached as Exhibit B.

[2] Settlement And License Agreement between Intertrust Technologies Corporation ("Intertrust") on one hand and Cinemark Holdings, Inc. ("Cinemark") and AMC Entertainment Holdings, Inc. ("AMC") on the other, dated ████ ██████ ("AMC Settlement"), excerpts of which are attached as Exhibit C.

1

Settlement and a manufacturer-level license with GDC for media blocks. These flaws render Dell's opinions unreliable and inadmissible under Rule 702 and controlling Federal Circuit precedent.

## I.    LEGAL STANDARD

Under Rule 702, an expert witness may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015).

Trial judges must act as gatekeepers for expert testimony by ensuring *its* scientific validity and proper application to case facts. *Daubert* at 592-93, 597. As such, a court "may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6*, 802 F.3d at 1295. In patent cases, the Rule 702 reliability requirement has specific requisites. Damages must be apportioned to the incremental value of the patented invention, not the entire value of the product or portfolio, unless the strict entire-market-value rule is satisfied. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-27 (Fed. Cir. 2014). License agreements can inform a reasonable royalty only if they are shown to be sufficiently comparable and are properly adjusted for differences in scope, context, and economic terms. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325-33 (Fed. Cir. 2009). Licenses granted to settle litigation require particular caution and rigorous adjustment to avoid importing litigation risk and bundled consideration into the hypothetical negotiation. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-73 (Fed. Cir. 2010); *LaserDynamics,* 694 F.3d at 68-70; *Prism Techs., LLC v. Sprint Spectrum, L.P.*, 849 F.3d 1360, 1370-72 (Fed. Cir. 2017). Dell's opinions do not satisfy any of these requisites.

██████████████████████████████████████

## II.    SUMMARY OF DELL'S DAMAGES OPINIONS

Dell opines that a reasonable royalty for GDC would be a flat ████ per accused media block, applied to ████ units, for total damages of █████████ DR ¶¶ 23, 300; DT 13:19-14:25. He claims the hypothetical negotiation would have occurred in December 2011 because that is the date GDC first sold the accused media blocks. *See e.g.,* DR ¶¶ 109, 218.

To arrive at his per media block rate, Dell starts with the ████████████████████ ████████████████████████████████████ ████████████ DR ¶¶ 131–134; DT 58:10-12. However, he admits that the parties ████████ ████████████████████████████████████ ████████████████████████████████████ DR ¶ 134. He then asserts that the ████ is already fully apportioned to the '602 and '603 patents, even though Intertrust asserted infringement of 11 patents in the complaint, (Ex. D, ████████████ ████████████████████████████████████ ████████ DR ¶¶ 132-139, 257-260; Ex. C, AMC Settlement §§ 1.4, 2; DT 45:25-47:21, 58:22-59:12. Next, Dell increases the ████████████████████████████████████ ████████████████████████████████████ DR ¶¶ 295-296; Ex. G, PPA § 5.7; DT 163:25-165:3. Finally, he adds an upward adjustment of █████████ DR ¶ 297; DT 202:7-203:2, 212:7-16. ████████████████████████████████ ████████████████ DT 212:7-9. ████████████████████████████████ DT 204:3-208:24.

On the royalty base side, Dell uses **all** accused GDC units sold in the United States between December 15, 2011 and January 20, 2023, minus certain sales to AMC, Cinemark, and Regal that he treats as licensed or released. DR ¶ 104, n.158; DT 75:25-76:10. The resulting count is ████ units. DR ¶ 23. He **assumes**, based on general equipment life-expectancy and warranty information, that units sold as early as 2011 remained in service and in infringing use by the

███████████████████████████████

exhibitors actively induced or contributed to by GDC during the 2018-2023 damages period, without adjusting for retirements, replacements, theater closures or a licensed theater group, such as Cinemark or AMC acquiring non-licensed screens. DR ¶ 102; DT 118:13-126:11. ████████ ███████████████████ DT 117:15-24.

Moreover, Dell does not account for the difference between GDC as a manufacturer and seller of media blocks, and theaters that receive revenues for playing movies on screens over time. Dell does not apportion the ████ rate between the '602 patent and the '603 patent. DR n.14; DT 79:11-80:11. His basis for refusing to apportion between the patents is a standards essential patents approach: both are needed for DCI compliance. Even assuming that these patents are standards essential, apportionment between them is required. DT 80:12-83:3.

## III.   DELL'S DAMAGES OPINION IS NOT BASED ON RELIABLE METHODOLGY

### A.   Dell's Heavy Reliance On a Litigation Settlement Agreement as Primary Benchmark Without Any Adjustment is an Unreliable Methodology

Dell's analysis is anchored almost entirely on the AMC Settlement. Under Georgia-Pacific Factor 1, he considers three Intertrust settlement agreements (AMC/Cinemark, Regal, and Dolby), but he elevates the AMC Settlement to the central, controlling benchmark while deeming Regal and Dolby "not economically comparable" and effectively discarding them. *See* DR ¶¶ 121-147, 257-260, 292; DT 90:8-91:9, 110:18-13.

The AMC Settlement is a litigation settlement resolving a pending infringement suit

███████████████████████████████████

███████████████████████ Ex. C, AMC Settlement Whereas cls., §§ 1.4, 2; DT 64:6-18.

███████████████████████████████████

███████████████████████████████████

███████████████████████████ DT 59:13-24;



DR ¶¶ 131, 134 ████████████████████████████████████████

████████████████████████████████████████████████

Federal Circuit precedent demands close examination of settlement-based, lump-sum portfolio licenses, as they often include litigation risk, bundled rights, and broader business factors. *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 77 (Fed. Cir. 2012) (Holding that an expert cannot assume that a rate in a settlement reflects the market value of the patents-in-suit). Yet that is exactly what Dell does: ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ DR ¶¶ 270-272, 290, 292, 295, 296; DT 289:1-12.

## B.    Dell Fails to Properly Apportion the Royalty Rate to the Alleged Inventions

Dell makes no attempt to satisfy the apportionment requirement. Instead, without any analysis, he declares that the ████████████████████████ is "fully apportioned" to the '602 and '603 patents applied to media blocks. DR ¶¶ 258–260, 292; DT 58:22-59:12, 143:21-144:14. His "support" for that conclusion is that: (1) those two patents were the only patents at issue by the time the parties settled and (2) ████████████████████████████████

████████████████████████████████████████████████

████████████████████ DR ¶¶ 135, 259; DT 74:19-75:2, 143:21-144:14. On this basis alone, Dell's opinion should be excluded. *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1344 (Fed.

Cir. 2025) (*en banc*) (patentee's testimony did not support damages when "[his] claim regarding calculation of the lump-sum amounts is not supported by any record evidence"). ███████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████ Ex. C, AMC Settlement §§ 1.4, 2; DT 45:10-48:18, 57:22-58:3.

This is apportionment by label, not analysis. The Federal Circuit has repeatedly held that when an expert relies on a portfolio license, he must apportion to isolate the value of the patents-in-suit, accounting for the value of additional patents and non-patent consideration. *Jiaxing Super Lighting Elec. Appliance, Co. v. CH Lighting Tech. Co., Ltd*, 146 F.4th 1098, 1112 (Fed. Cir. 2025) (collecting cases where expert testimony was excluded when it fails to allocate license fees among the licensed patents in an agreement.). Dell's assertion that the AMC/Cinemark ███ ███ rate is already "fully apportioned" because only two patents remained in litigation at the time of the settlement does not satisfy this requirement. *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1298 (Fed. Cir. 2025) (affirming exclusion of damages expert "[b]ecause [the damages expert's] opinion 'fail[ed] to allocate license fees among the licensed patents covered by [the] agreement'" used by the expert.)  In addition to not apportioning ███████████

███████████████████████████████████

███████████████████████ not to mention the ongoing revenue associated with using a screen compared to the one-time income of selling a media block.

Dell also improperly conflates the alleged inventions of the '602 and '603 patents with DCI compliance as a whole.

█████████████████████████████

██

DT 36:10-15. Throughout his report and deposition, he repeatedly treats "DCI compliance" as if it were coextensive with the claimed inventions, and then relies on the critical importance of DCI compliance to justify both his use of the ███████ number from the AMC Settlement and ultimate ████ rate. *See, e.g.*, DR ¶ 241, (asserting that the benefits of the asserted patents "enable the necessary security and DCI-compliance"); *see also* DR ¶¶ 137, 256, 279. 297, 302; DT 35:21-25, 211:12-16 (testifying that GDC "████████████████████████████

████████████████████████████████

███████████████████████

Dell does not analyze what portions of the DCI specification are satisfied by other technologies or standards-based features, or how to separate the economic value of the claimed inventions from the broader, multi-component DCI compliance stack. *See Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1304 (Fed. Cir. 2015) ("damages awards for SEPs must be premised on methodologies that attempt to capture the asserted patent's value resulting ***not from the value added by the standard's widespread adoption***, but only from the technology's superiority.") (emphasis added) (internal citations omitted). Instead, he assumes that because GDC media blocks must be DCI compliant, the asserted patents are responsible for the entire value associated with DCI compliance. This is the opposite of what the law requires. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018) (Requiring apportionment "if the smallest salable unit – or smallest identifiable technical component – contains non-infringing features. . ."); *Ericsson*, 773 F.3d at 1228 (must "apportion the ultimate royalty award to the incremental value of the patented feature from the overall product."). Indeed,

GDC received a third-party patent technology watermark from NexGuard—also needed for DCI compliance—for ▮▮▮▮▮▮ a server. DR ¶ 158, 161. Dell completely discounted it because Mr. Karagosian said that the watermark technology licensed was "not technologically comparable" to the asserted patents. The inconsistency is glaring – Dell does not apportion between the '602 patent and the '603 patent, though they are technologically different, because they are "DCI required" then ignores the DCI required watermark license because it is technologically different. DR ¶¶ 162-163.

Finally, Dell uses the ▮▮▮▮ rate regardless of whether only the '602 patent is infringed, only the '603 patent is infringed, or both are infringed. DR n.14; DT 79:11-80:11. ▮▮▮▮▮



▮▮▮ DT 82:14-19. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, 82:14-83:3, DR n.14. Treating each patent as if it independently captured the entire value of the combination contravenes the apportionment principle. *Ericsson,* 773 F.3d at 1226 ("the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.").

### C.    Dell's Exclusion of Other Data Points Illustrate the Unreliability of His Reliance on the AMC Settlement

Dell's treatment of Intertrust's settlement agreements with Regal and Dolby settlements underscores his inconsistent approach. He dismisses the Intertrust–Regal settlement as economically incomparable because Regal was under financial distress during the COVID period ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DR ¶¶ 125-126; DT 89:15-91:9. Yet the AMC Settlement was also negotiated during a COVID downturn and Dell uses that same economic hardship as a reason to increase the AMC/Cinemark rate for a hypothetical negotiation

in 2011, on the theory that the 2022 settlement rate was "discounted" and must be "reconciled upward." DR ¶¶ 136-137; DT 98:17-99:10. Thus, COVID-related distress is invoked as a reason on the one hand to exclude Regal but as justification on the other hand to raise AMC/Cinemark's rate – a result-driven inconsistency that undermines the reliability of his comparability analysis. *See In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 357 (S.D.N.Y. 2023) (finding an expert's analysis based on cherry picked findings inadmissible under Rule 702).

Similarly, he deems the Intertrust–Dolby settlement ███████████████████████ ████████ as not economically comparable ████████████████████████████ ███████████████████████████████ DR ¶¶ 145-146; DT110:18-13. ████████████ ████████████████████████████████████████████████ DT 113:6-114:2. Dell makes no meaningful effort to use Dolby's settlement as a check or lower bound; instead, it is disposed of on a rationale ██████████ that, if applied uniformly, would cast doubt on the AMC Settlement as well. DR ¶¶ 145-147.

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ DR ¶¶ 199-200; DT 186:5-15. ████████████████████████ ████████████████████████████████████████ DR ¶ 201. DT 190:25-191:13. Ye███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ DT 198:22-199:5. This selective use of licensing evidence – embracing the AMC Settlement ████████████ ████████████████████████████████ while rejecting Regal, Dolby, and

- 9 -

GDC-specific offers on inconsistent grounds – is improper. *ResQNet*, 594 F.3d at 871-72 ("The first Georgia–Pacific factor [] must consider licenses that are commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question.").

### D. Dell Fails To Account For the Different Economic Roles of Exhibitors and Manufacturers

Dell's use of an exhibitor-level settlement (AMC Settlement) as directly transferrable to a manufacturer-level license with GDC, without accounting for the disparate economic roles and positions in the value chain, is a fatal error. AMC and Cinemark are exhibitors with revenues derived from ticket sales, concessions, and in-theater spending. ███████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. E, DCRD at 3. ███████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 3-6.

GDC, by contrast, is a media block manufacturer. DR ¶¶ 37-41. From the first sale of a DCI Compliant media block in December 2011 through January 20, 2023, GDC's revenues from the accused media block sold in the United States totaled ████████ with a gross profit per unit of ██████ and an overall profit margin of 3████ DR, Attachment 12. Dell's own analysis shows that, around the 2011 hypothetical negotiation, GDC's average selling price for accused units was approximately $████ and its gross margin was about ████ implying per-unit profits of roughly ████ . DR Fig. 5C; DT 28:15-25. Notably, Dell's proposed royalty rate of ████ is quantifiably the entirety of GDC's profits.

To justify his entire profit royalty rate, Dell simply assumes that GDC would pass the entire ███ royalty through to its customers. DR ¶¶ 186, 195, 224, 279. He points to evidence that GDC has, in some contexts, ████████████████████████████████████ and to industry practices such as virtual print fees, and from this infers that GDC would or could raise its prices by ███ per server and thereby preserve its profit margin. DR ¶ 224, 303; DT 29:17-25.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███ *Id*. 30:1-30:16. Second, Dell misrepresents the circumstances that he relies on regarding evidence that GDC ████████████████████ – the deposition testimony of Dr. Chong, CEO of GDC ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Ex. F, Chong Tr. 300:15-301:9. Here Dell opines that GDC would pass on a ███ royalty per media block to **all** customers, rather than a small subset, regardless of and without regard or analysis of market realities.

By treating the rate from the AMC Settlement as if it reflected a manufacturer's hypothetical negotiation and by assuming perfect pass-through of a confiscatory royalty, Dell ignores the distinct economic realities of exhibitors and manufacturers. That is not consistent with the requirement that a reasonable royalty reflect a willing licensor–willing licensee negotiation between the actual parties, in their actual roles in the marketplace. *See Finjan, Inc. v. Secure Computing Corp*., 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("We have recently reiterated that use of past patent licenses under factors 1 and 2 must account for differences in the technologies and ***economic circumstances*** of the contracting parties.") (emphasis added).

- 11 -

**E.    Dell's Upward Adjustments From ███████████ are Arbitrary and Not Grounded in Any Reproducible Methodology**

Apart from the problems with using the AMC Settlement in the first place, Dell's adjustments from ███████████ not grounded in any reproducible methodology.

First, he makes no time-value-of-money adjustment. The hypothetical negotiation is in 2011; the AMC Settlement was made in 2022. Dell acknowledges the basic principle that a dollar today is not worth the same as a dollar in 2011, ████████████████████████████ ████████████████████████ DT 24:6-26:4. This failure to perform basic expert analysis is representative of the systematic deficiencies in Dell's Report.

Second, he increases the ██████████ relying on the PPA, ████████████ ████████████████████████████████████████████ Ex. G, PPA § 5.7; DR ¶ 299; DT 169:1-170:25. Dell describes this ████████████████████ ████████████████████████████████████████████ ████ DR ¶¶ 295-296; DT 169:1-170:25. ████████████████████████ ████████████████████████████ DT 167:6-168:12, Ex. G, PPA at Exhibit B. It is not a royalty rate negotiated with AMC, Cinemark, GDC, or any licensee, and ████████████████████████████████████ *Id.*, 178:5-179:10. There is no principled basis ████████████████████████████ ████████████████████ that must be reversed out of the rate from the AMC Settlement.

Third, Dell's final increase from ████████████████████████ lacks any defined calculation. ████████████████████████████████████████ rather, he "informed" the rate by the Georgia-Pacific factors and the technological importance of the patents, and concluded that ████ best reflected those considerations. DT 212:7-16; DR ¶ 297. That is not

a quantifiable method but a conclusory endpoint, leaving "too great an analytical gap between the data and the opinion." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). !

Compounding the impropriety of Dell's conclusion, Dell's ▆▆▆ rate essentially equals GDC's per-unit gross profit, as he calculates approximately ▆▆▆▆▆▆▆ margin at time of the hypothetical negotiation. DR Fig. 5C; DT 28:15-20. ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆ DT 28:22-31:3.

### F.     Dell's Royalty Base is Overinclusive and Relies On Unverified Assumptions

Dell's royalty base consists of all accused units sold in the United States from December 15, 2011 through January 20, 2023, less certain sales to AMC, Cinemark, and Regal that he treats as licensed or released, for a total of ▆▆▆ units. DR ¶¶ 104, n.158; DT 75:25-76:10. The damages period begins in 2018, yet Dell includes pre-2018 sales in full, on the theory that units typically last at least ten years. He relies on mean-time-to-failure statistics, warranty periods, and expert statements about equipment lifecycles to conclude that units sold in 2011 would likely still be in use as of 2018. DR ¶ 102; DT 118:13-119:22.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ DT 123:1-129:7. He effectively equates every sale into the United States to ongoing infringing use during the entire damages period, despite the presence of method claims and despite lacking any direct evidence of actual use for each unit. DR ¶ 100-104. That is not a reliable basis for counting infringing "use" under a method claim. *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299,

- 13 -

1314–15 (Fed. Cir. 2020) ("Method claims are not directly infringed by the mere sale of an apparatus capable of performing the claimed process.") (internal citation omitted). Moreover, Dell fails to address any limit on the royalty base for GDC's alleged contributory infringement. Indeed, GDC cannot be liable for damages based on contributory or induced infringement on sales made prior to the damages window. *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348 (Fed. Cir. 1985) (finding no contributory or inducement of infringement for alleged infringing product sales made prior to the damages period, stating if defendant's "acts ever gave rise to a liability, the liability arose ***as of the time the acts were committed,*** not at some future date determined by the acts of others.") (emphasis in the original).

████████████████████████ GDC sold ██ accused units to Starplex Cinemas, that AMC later acquired Starplex (33 theaters, 346 screens) in 2015. DT 75:25-10, 124:21-125:9; Ex. H, Press Release. Under his own approach, the ██ units sold to Starplex should have been treated as licensed after AMC's acquisition and removed from the royalty base under his licensing theory.

████████████████████████████████████████████

████ DT 126:2-11. This omission inflates his base and demonstrates that he has not reliably applied his own criteria for excluding licensed units.

### G. Dell Makes No Adjustment to the AMC/Cinemark Rate in View of the Different Damages Theory Intertrust Asserted In That Case

While Dell relies on the ████████████ rate from the Intertrust Cinemark/AMC agreement, he did not factor in or consider the damages methodology employed by Intertrust in that case. Intertrust's damages expert in the Intertrust v. Cinemark/AMC litigation, Mr. Yurkerwich, employed a very different methodology, as described in Intertrust's brief opposing a Daubert motion in that case (Ex. 84). There, Intertrust argued that the appropriate base was the number of "digital prints," i.e., movies played, and that the reasonable royalty should be tied to

- 14 -

the incremental movie revenues attributable to digital conversion, apportioned to isolate the patented technology's contribution. Ex. I, Opp. at 4, 6-7; DT 148:10-25, 151:22-152:25. Intertrust represented to the court that "the infringement is by Defendants showing movies" and "[n]either media blocks nor 'some other portion of the digital cinema equipment' is an accused product to which the value of the patented technology must be tied." Ex. I, Opp. at 7-8; DT 155:18-156:3.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████  DT 146:5-147:8.  ██████████████████████████████████████

████████████████████████████████████████████████████████████████

161:23-163:5. As discussed above, Dell's methodology uses an equipment-sales base and a flat per-media block rate. He does not tie his analysis to the number of movies shown or the revenue generated from them, ████████████████████████████████████████████

████████████████████████████████████  DT 157:7-13. This failure by Dell to have considered the impact of the markedly different damages methodology used in the Cinemark/AMC case further erodes the reliability of Dell's assumption that ████████████ converts to a fully apportioned rate for the inventions claimed in the '602 and '603 patents.

## IV.    CONCLUSION

For the reasons above, the Court should exclude Dell's testimony in its entirety and strike his expert report. At a minimum, the Court should preclude him from: (1) treating the AMC/Cinemark ██████████████ as "fully apportioned" to the '602 and '603 patents; (2) applying any ████████████ based on the PLS–Intertrust PPA; (3) applying a ████████ per-unit rate equal to GDC's profit without a proper incremental-value and market-demand analysis; and (4) using a ████████ royalty base without reliable evidence that those units were unlicensed and used to perform the claimed methods of the asserted patents during the damages period.

- 16 -

Dated: January 28, 2026                    */s/Paul V. Storm*

Paul V. Storm
State Bar No. 19325350
Email: pvstorm@foley.com
Rachel L. Gillespie
State Bar No. 24144005
Email: rgillespie@foley.com
**Foley & Lardner LLP**
2021 McKinney Ave, Suite 1600
Dallas, TX 75201
Phone: 214.999.3000
Fax: 214.999.4667

Bradley D. Roush (*admitted pro hac vice*)
D.C. Bar No. 1020534
**Foley & Lardner LLP**
3000 K Street NW, Suite 600
Washington, D.C. 20007-5109
Phone: (202) 672-5300
Fax: (202) 672-5399
Email: broush@foley.com

Roland M. Potts (*admitted pro hac vice*)
FL Bar No. 87072
**Foley & Lardner LLP**
2 S. Bicayne Blvd., Suite 1900
Miami, FL 33131-1832
Phone: (305) 482-8400
Fax: (305) 482-8600
Email: rpotts@foley.com

Michelle A. Moran
WI State Bar No. 1073953
**FOLEY & LARDNER LLP**
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Tel.: 414.271.2400
Fax: 414.297.4900
Email: mmoran@foley.com

*Attorneys For Defendant*

- 17 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 28, 2026, a copy of the foregoing was served on all counsel of record who consent to electronic service via email.

/s/Paul V. Storm
Paul V. Storm

## CERTIFICATE OF CONFERENCE

The undersigned certifies that the foregoing motion was filed in compliance with Local Rule CV-7(h) and (i). As such, counsel for Defendant and Plaintiff have met and conferred via video conference on January 27, 2026 regarding the filing of this motion, which is opposed. Attendees to the conference were: Paul V. Storm and Roland Potts for GDC and Jordan Kaeracher, Moon Hee Lee and Claire Henry for PLS IV. Counsel discussed the merits and strength of Defendant's motion and no agreement could be reached because the parties disagree on the admissibility of testimony and opinions sought to be stricken in the motion. As such, the Parties are at an impasse, leaving the issue open for the Court to resolve.

/s/Paul V. Storm
Paul V. Storm

18