# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

PLS IV, LLC, a Delaware LLC,

      Plaintiff,

  v.

GDC Technology Limited, a foreign company,

      Defendant.

Civil Action No. 2:24-cv-00466-JRG

FILED UNDER SEAL

## DEFENDANT GDC TECHNOLOGY LIMITED'S OPPOSITION TO PLAINTIFF PLS IV, LLC'S MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF BRUCE L. BLACKER

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.   PLS'S CRITICISMS GO TO WEIGHT, NOT ADMISSIBILITY .................................... 2

      A.    The NexGuard License is Technologically Comparable to the Asserted Patents in View of DCI Compliance Security Requirements .................................................... 3

      B.    Disagreement with Mr. Blacker's Royalty Base Construction Is Not a Rule 702 Issue ....................................................................................... 7

      C.    Mr. Blacker's Opinion Regarding the Dolby Settlement Should Not Be Stricken  8

            1.    PLS's "untimely market-share" argument fails. .......................................... 8

            2.    Mr. Blacker's reliance on Dr. Chong's market share information is proper. ....................................................................................... 10

      D.    ████████████████████████████████████████████ ......................... 12

      E.    PLS's Challenge to Mr. Blacker's Use Of the Sony Agreement and the Christie Proposal Should Be Rejected ............................................................... 14

III.  CONCLUSION ............................................................................................ 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
967 F.3d 1353, 1373-74 (Fed. Cir. 2020) ............................................................. 4, 5

*Biscotti Inc. v. Microsoft Corp.*,
No. 213CV01015JRGRSP, 2017 WL 2607882 (E.D. Tex. May 25, 2017) ......................... 6, 15

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ................................................................................. 2, 4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...................................................................................................... 2

*Deere & Co. v. Int'l Harvester Co.*,
710 F.2d 1551 (Fed. Cir. 1983) ................................................................................. 12

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir.) (*en banc*), cert. denied, 146 S. Ct. 333 (2025) .................... 10, 11

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
No. 2:22-CV-00125-JRG, 2023 WL 8260866 (E.D. Tex. Nov. 28, 2023) .......................... 10

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ........................................................................... 2, 4, 6

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ................................................................................... 4

*GREE, Inc. v. Supercell Oy*,
No. 2:19-CV-00311-JRG, 2021 WL 603726 (E.D. Tex. Feb. 16, 2021) .......................... 10

*MCI Commc'ns Servs., Inc. v. Hagan*,
641 F.3d 112 (5th Cir.) ............................................................................................... 11

*Packet Intel. LLC v. NetScout Sys., Inc.*,
965 F.3d 1299 (Fed. Cir. 2020) ................................................................................... 7

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 13601 (Fed. Cir. 2017) ................................................................................. 9

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
754 F.2d 345 (Fed. Cir. 1985) ..................................................................................... 7

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)................................................................... 2, 10, 11

*Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, In*c.,
    32 F.4th 1161 (Fed. Cir. 2022) .............................................................................. 14

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)............................................................................. 4, 5

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)............................................................................... 11

**Statutes**

35 U.S.C. § 286............................................................................................................ 6, 7

**Rules**

Fed. R. Evid. 408 ................................................................................................ 12, 13, 14

Fed. R. Evid. 702 ....................................................................................................... 2, 6

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | Expert Report of Gerald H. Pierce, dated January 13, 2026 (excerpted) |
| 2 | Deposition of Stephen E. Dell, dated January 20, 2026 (excerpted) |
| 3 | Deposition of Bruce Blacker, dated January 22, 2026 (excerpted) |

## I.    INTRODUCTION

PLS IV, LLC's ("PLS") motion to exclude GDC Technology Limited's ("GDC") damages expert Bruce L. Blacker, (Dkt. No. 83), is inconsistent with both Rule 702 and PLS's own damages case. Mr. Blacker uses conventional methodologies that the Federal Circuit has repeatedly approved – relying on closely related licenses involving the accused media blocks, tying his analysis to actual sales during the statutory damages period, and using settlement agreements and negotiations as reasonableness checks. PLS does not identify any step in his methodology that falls outside the bounds of accepted practice. Instead, PLS largely disagrees with the analysis, which is not an appropriate ground to exclude its presentation to a jury. For example, with respect to Mr. Blacker's royalty base, PLS simply disagrees with Mr. Blacker's analysis rather than his methodology. Moreover, for the determined royalty rate, PLS attacks Mr. Blacker's use of the NexGuard Digital Cinema Watermark Technology License Agreement, ("NexGuard License"), a Digital Cinemas Initiative ("DCI") required technology and an integral security feature, as "not technologically comparable." However, this is in direct contrast to Mr. Dell's repeated characterization that DCI compliance is indispensable, driving the value of the Asserted Patents, and relies heavily on that same DCI compliance to inflate his rate and treat the Asserted Patents (also purported integral security features) as if they were the center of the DCI compliance universe.

In its motion, PLS asks the Court to apply a one-sided evidentiary rule. It seeks to bar Mr. Blacker from relying on: (1) the NexGuard License for watermarking that is necessary for the media blocks to comply with DCI requirements related to security functions; (2) settlement agreements and ██████████████, even though Mr. Dell treats the AMC/Cinemark settlement as his primary rate benchmark and leans on ████████████████████████ ████; and (3) GDC's internal business information regarding market share.

1

Rule 702 does not support this asymmetry. The question is whether an expert's methods are reliable and reasonably applied to the facts – not whether his conclusions favor one side or the other. See Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., In*c., 509 U.S. 579, 592–95 (1993).

Under that standard, Mr. Blacker's opinions are admissible. He grounds his reasonable royalty rate in the DCI required watermarking NexGuard technology license for use in the accused media blocks, as well as a comparable license with one of GDC's competitors, ties his base to actual sales of accused units during the six-year damages window, and treats settlements and pre-suit negotiations as contextual checks, not as plug-and-play royalty rates. Any criticisms PLS has go to weight, not admissibility. The motion should be denied.

## II.    PLS'S CRITICISMS GO TO WEIGHT, NOT ADMISSIBILITY

PLS's specific objections do not show that Mr. Blacker's opinions are the product of unreliable methods or an unreliable application of those methods. Indeed, PLS's motion is essentially silent regarding Mr. Blacker's methodology. Mr. Blacker's methodology follows the "market approach" that the Federal Circuit recognizes as a generally reliable way to estimate a reasonable royalty: he looks to an actual license entered into by GDC as a primary benchmark, as well as a license granted to Dolby, a competitor of GDC in the media block market and licenses granted by Intertrust as reasonableness checks, for technology used in the accused media blocks and in the same industry. *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.,* 809 F.3d 1295, 1302-03 (Fed. Cir. 2015) ("CSIRO"). At most, PLS raises issues that can be explored on cross-examination and weighed by the jury. That is not a basis for exclusion under Rule 702. *See Summit 6, LLC v. Samsung Elecs. Co*., 802 F.3d 1283, 1299 (Fed. Cir. 2015) ("To the extent [the expert's] credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility" and finding no abuse of discretion by the lower court when allowing expert testimony); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir.

2014) ("Testimony relying on licenses must account for such distinguishing facts when invoking them to value the patented invention. Recognizing that constraint, however, the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility.").

### A.    The NexGuard License is Technologically Comparable to the Asserted Patents in View of DCI Compliance Security Requirements

PLS asserts that the NexGuard license is supposedly not "technologically comparable" because watermarking is a detection mechanism, whereas PLS alleges the Asserted Patents cover two DCI security related features, (1) creating and transmitting a security log report and (2) maintaining security during playback of digital content., and that Mr. Blacker did not do "enough" analysis to support relying on that license. Dkt. No. 83, (PLS Mot.) at 8-12. PLS's argument fails under Federal Circuit precedent.

Mr. Blacker's primary benchmark is the NexGuard License. That license gives GDC ███████████████████████████████████████████ – **a security feature required for DCI compliance** – in GDC's accused media blocks. It is a ████████████ used by the accused media blocks, in the same DCI compliance ecosystem, and uses a per-unit royalty structure with ██████████████████████████ per server, including during the period of when the hypothetical negotiation would have taken place. Dkt. No. 83-1, (Blacker Rep.) ¶¶ 140-155, 168-173; *see* Dkt. No. 93-1, (Dell Rep.) ¶¶ 158, 161. Unlike the AMC Settlement that drives Mr. Dell's rate, (Dkt. No. 93-1, ¶¶ 128-139), ████████████████████████████████████████████ ████████████████████████████████ Dkt. No. 83-1, ¶¶ 140-155. Rather, it is a commercial license between GDC and a security-technology provider for DCI required security functionality embedded in the accused media blocks that was originally entered into near the hypothetical negotiation date. *Id.*, ¶¶ 140-155, 168-173. *Virnetx* and *CSIRO* expressly contemplate relying on such licenses where they involve comparable technology in the same

economic context as long as any "differences in the technologies and economic circumstances of the contracting parties" are accounted for, comparability is not an identity test. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)); *CSIRO*, 809 F.3d at 1303-04.

The NexGuard License satisfies that standard. Both the NexGuard License and, as PLS alleges, the Asserted Patents are directed to security requirements for DCI compliance in the same accused GDC digital cinema media blocks. Dkt. No. 83-1, ¶¶ 57-60, 140-155, 201-204. The NexGuard License provides forensic watermarking functionality; as PLS alleges, the Asserted Patents cover two DCI security related features, (1) creating and transmitting a security log report and (2) maintaining security during playback of digital content. *Id.* Both are DCI compliance required features implemented on the same hardware and licensed on a per-unit basis to the same licensee (GDC) in the same industry. *Id*. ¶¶ 140-155, 168-173. That is precisely the kind of relevant technology and economic circumstance overlap the Federal Circuit has found sufficient. *See  Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc*., 967 F.3d 1353, 1373-74 (Fed. Cir. 2020); *VirnetX*, 767 F.3d at 1330-31.

PLS's attempt to disqualify Mr. Blacker's opinion regarding the NexGuard License simply because watermarking detects piracy while, as PLS alleges, creating and transmitting a security log report and maintaining security during playback of digital content respond to certain misuses, conflates technical identity with legal comparability. The case law does not require that the licenses cover the exact same functionality; it requires that the expert explain the differences and adjust accordingly. *VirnetX*, 767 F.3d at 1330-31; *Ericsson,* 773 F.3d at 1227-28.

That is what Mr. Blacker does. Indeed, Mr. Blacker describes the scope of the NexGuard License, explaining that it covers forensic watermarking on GDC servers and media blocks as

required by DCI standards. Dkt. No. 83-1, ¶¶ 140-155. The record shows that forensic watermarking is a linchpin of anti-piracy efforts. Ex. 1, Pierce Rep. ¶¶ 5, 34, 42. This technology targets the predominant piracy risk – camcorder capture in theaters – and because it is actively used to detect and trace infringing streams, the accused media blocks must use watermarking technology. Dkt. No. 83-1, ¶¶ 200-203; Ex. 1, ¶¶ 5(g), 33-36. The same record shows creating and transmitting a security log report and/or maintaining security during playback, as PLS alleges are claimed in the Asserted Patents, are rarely, if ever, performed by the accused media blocks. Dkt. No. 83-1, ¶¶ 57-60, 198-204; Ex. 1, ¶¶ 5, 34, 42. Based on this distinction, he concludes that a prudent licensee would not negotiate to pay as much per unit for the infrequently used patented features as for NexGuard's widely adopted watermarking technology. Dkt. No. 83-1, ¶¶ 216-218. Therefore, he estimates that the appropriate rate for the patents should fall at or below the lower end of the NexGuard range. *Id.*

That is more than the "some explanation" of comparability and difference that *VirnetX* and *Bio-Rad* require. *See VirnetX*, 767 F.3d at 1330-31; *Bio-Rad*, 967 F.3d at 1373-74. PLS's assertion that Mr. Blacker needed an additional, undefined "quantitative" breakdown to render his opinion based on the NexGuard License admissible is wrong, rather any questions about his analysis should be heard by the jury. *See VirnetX*, 767 F.3d at 1331 ("Nevertheless, we concluded that the 'degree of comparability' of the license agreements was '[a] factual issue[ ] best addressed by cross-examination and not by exclusion.' Similarly, here, though there were undoubtedly differences between the licenses at issue and the circumstances of the hypothetical negotiation, the jury was entitled to hear the expert testimony and decide for itself what to accept or reject.") (internal citations omitted). PLS's reliance on *Biscotti* is misplaced because there the licenses in question related to compliance with the HDMI standard, but neither the damages expert nor the technical

expert provided any analysis tying the licensed HDMI technology to the invention claimed in the asserted patent. *Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL 2607882, at \*3 (E.D. Tex. May 25, 2017). Here, by contrast, both the licensed watermarking technology and the alleged inventions claimed in the Asserted Patents are required for the same industry standard – DCI compliance – and Mr. Blacker explains that in his comparability analysis.

PLS also ignores that its own damages expert's theory rests on the premise that the Asserted Patents' value lies in "DCI compliance" of GDC's servers and media blocks. Dkt. No. 93-1, (Dell Rep.) ¶¶ 137, 241, 279, 285; Dkt. No. 93-2, (Dell Tr.) 36:10-15 ("█████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ████████ ██████████████████████ Ex. 2, (Dell Tr.) 224:13-17. On that theory, the comparability of another DCI compliance mandated security feature, licensed per unit on the same devices, is especially clear. PLS cannot, on the one hand, tell the jury that the Asserted Patents are valuable because they are allegedly "required for DCI compliance," and, on the other, tell the Court that a per-unit license for a DCI compliance required security feature is too dissimilar to inform the reasonable royalty.

In short, the NexGuard License is "sufficiently comparable," and Mr. Blacker has done exactly the type of qualitative analysis the Federal Circuit expects. PLS's criticisms go to the weight the jury should give his NexGuard License-based rate, not to whether he should be allowed to present it. *Ericsson*, 773 F.3d at 1227 (While an expert must account for distinguishing facts of licenses used to value the patented invention, "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility.").

**B.    Disagreement with Mr. Blacker's Royalty Base Construction Is Not a Rule 702 Issue**

PLS objects that Mr. Blacker's base is too narrow because he counts only sales of accused media blocks during the six-year limitations period, whereas Mr. Dell also includes units sold before June 21, 2018 that he believes were "likely still in use" during the damages window. Dkt. No. 93-1, (Dell Rep.) ¶ 102. That is, at most, a disagreement over the proper scope of the base; it is not a methodological defect.

Section 286 limits recovery to six years before the complaint. 35 U.S.C. § 286. The Federal Circuit has made clear that for method claims, damages must track infringing **use** within the limitations period, not just historical sales of capable devices. *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1314-15 (Fed. Cir. 2020); *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348 (Fed. Cir. 1985). Mr. Blacker's decision to confine his base to sales during the June 21, 2018-January 20, 2023 period is entirely consistent with those authorities. Dkt. No. 83-1, ¶ 220. He does not speculate about whether older devices "likely" remained in service; he uses actual sales data within the statutory window. Should PLS provide evidence that any accused media blocks sold before the June 21, 2018 damages window opening date were used in an infringing manner during the damages window, then those units can be added to the royalty base. Ex. 3, Blacker Tr. at 218:7–219:10.

PLS also asserts that Mr. Blacker was required to "assume infringement" and therefore could not, as a matter of methodology, constrain his base to accused units sold during the statutory period. Dkt. No. 83 at 12. That mischaracterizes what Mr. Blacker did. He did not purport to decide liability or to exclude specific units because he personally believed they were "non-infringing." Rather, he accepted PLS's theory that GDC's media blocks are capable of practicing the asserted methods, (Dkt. No. 83-1, ¶ 4), and then applied a legally conservative approach to defining the

compensable base: tying the royalty only to sales of those accused media blocks during the June 21, 2018–January 20, 2023 limitations period, as § 286 requires. *See* 35 U.S.C. § 286. The fact that PLS would prefer to add earlier sales based on its assertion that those units were "very likely still in use," (Dkt. No. 93-1, (Dell Rep.) ¶ 102), does not convert Mr. Blacker's decision to use an actual in-period sales base into an impermissible "non-infringement" assumption; it simply reflects a more conservative view of the base. Nor is there any requirement he adopt PLS's base.

Mr. Dell adds another ▮▮▮▮ units to his base based on his belief that they "would very likely still be in use" as of June 2018 and that continued use would be sufficient for GDC to be liable for induced and/or contributory infringement. *Id*. Whether that expansion is appropriate is a question for the jury. It does not render Mr. Blacker's more conservative, statute-bounded base inadmissible. Again, any disagreement on this point goes to which expert the jury believes, not to whether Mr. Blacker's method is so unreliable it must be excluded.

## C. Mr. Blacker's Opinion Regarding the Dolby Settlement Should Not Be Stricken

PLS devotes much of its motion to the Intertrust–Dolby Settlement and License Agreement ("Dolby Settlement"), but PLS fails to find fault with Mr. Blacker's methodology. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. No. 83-1, ¶¶ 113–119. Mr. Blacker expressly acknowledges that this is a broad, litigation-driven settlement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and he makes the required adjustments to determine the Asserted Patents' value to GDC. *Id*. ¶¶ 11, 165, 176-178, 199, 207, 222–224.

### 1. PLS's "untimely market-share" argument fails.

PLS argues that Mr. Blacker's use of relative GDC/Dolby market share to scale the Dolby Settlement should be stricken because GDC supposedly failed to produce "market share"

documents during fact discovery. Dkt. No. 83 at 4-5. That argument overstates any alleged discovery issue. First, the market-share ratio is used to adjust or apportion the Dolby Settlement to GDC and also as secondary crosscheck. Dkt. No. 83-1, ¶¶ 11, 223-224. Relying on information from his conversation with Dr. Chong that Dolby has a larger installed base of digital cinema servers and media blocks than GDC in the North American market, he applies the ratio of GDC's share to Dolby's share ███████████████████████████████████████ *Id*. ¶¶ 221-223; Dkt. No. 83-2, Attach. A-4, E-3. He then notes that even this scaled number overstates what GDC would pay for a U.S.-only license to two patents, in contrast to the Dolby Settlement which ended the litigation between Intertrust and Dolby and provided Dolby ████████ ██████████████████████ Dkt. No. 83-1, ¶¶ 222-224.

The purpose of this exercise of applying the market share is to determine what GDC would be willing to pay based on what GDC's main competitor, Dolby, actually paid. *Id.* ¶¶ 11, 165, 176-178, 199, 207, 222–224. This carefully explained use of a settlement license is exactly the type of treatment the Federal Circuit has approved. *Prism Techs. LLC v. Sprint Spectrum L.P.,* 849 F.3d 1360, 1370-1371 (Fed. Cir. 2017) (finding no abuse of discretion by the lower court's decision to not exclude a settlement agreement).

Second, Mr. Blacker testified that Dr. Chong provided approximate relative-share figures orally; he did not testify that he saw or relied on any "market share report" document. Dkt. No. 83-3, (Blacker Dep.) 132:3-24. Notably, PLS never sought market share information and PLS failed to ask Dr. Chong any questions regarding market share during his deposition. PLS's untimely request for market share data, based on Mr. Blacker's reliance in his **rebuttal** damages report of a conversation between him and GDC improperly implies that GDC has market share documents and should have anticipated PLS's damages arguments.

Third, the cases PLS cites in support of striking Mr. Blacker's opinion are not analogous. In *Entropic*, the expert relied on an actual license agreement that had never been produced, depriving the defendant of any discovery into that license itself. *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-CV-00125-JRG, 2023 WL 8260866, at *4 (E.D. Tex. Nov. 28, 2023). In *GREE*, the court struck an opinion that depended on technical information and documents first revealed in the expert report. *GREE, Inc. v. Supercell Oy*, No. 2:19-CV-00311-JRG, 2021 WL 603726, at *3 (E.D. Tex. Feb. 16, 2021). Here, there is no undisclosed license, no new feature, and no new category of damages. PLS has had full discovery into the Dolby Settlement and the digital-cinema market, had the opportunity to request market share information from GDC, and did not do so, had the opportunity to depose GDC's management and 30 (b) (6) witnesses on market share and did not do so, and cross-examined Mr. Blacker on his use of market shares within a **rebuttal** damage report. Any complaint that it would have taken more discovery on market share is, at most, a disagreement over the weight of that apportionment, not a basis for exclusion.

If the Court has fairness concerns, PLS can address them during cross-examination by noting that percentage shares were not based on a "market share" report. *Summit 6*, 802 F.3d at 1299. Excluding use of Mr. Blacker's opinion regarding the Dolby Settlement would be excessive.

### 2. Mr. Blacker's reliance on Dr. Chong's market share information is proper.

PLS then complains Mr. Blacker failed to reliably account for the differences between the Dolby Agreement and the hypothetical negotiation, dismissing Dr. Chong's estimates of GDC's and Dolby's relative installed-base shares as "*ipse dixit*" such that Mr. Blacker therefore cannot use them to scale the Dolby settlement. Dkt. No. 83 at 5-8. That criticism does not warrant exclusion.

- 10 -

*EcoFactor*-style "ipse dixit" concerns arise when an expert's base or rate is derived from an untested assertion with no grounding in market reality. *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1344-46 (Fed. Cir.) (*en banc*), cert. denied, 146 S. Ct. 333 (2025). In *EcoFactor*, the patent owner's expert relied on the CEO's unsupported assertion that a specific royalty rate was used to generate the lump sum payments in the licenses the export relied on, even though the CEO had no access to that information. *Id.* That is not what is happening here. Dr. Chong is a pioneer in the digital cinema industry and founder and CEO of GDC Technology, with first-hand knowledge of the relevant time period and the market for DCI compliant media blocks. Given his role and experience, it is entirely reasonable and methodologically sound for Mr. Blacker to treat market share information provided by Dr. Chong as a reliable factual basis to scale the Dolby Settlement.

PLS's reliance on *Wordtech* is equally misplaced because that case addresses a speculative jury verdict, not a license-based expert analysis like Mr. Blacker's. In *Wordtech*, the Federal Circuit set aside a lump-sum award where the patentee offered a handful of licenses but never connected their terms to the accused sales. 609 F.3d 1308, 1319-22 (Fed. Cir. 2010). The jury's $250,000 number could not be tied to any established royalty, to any specific license, or to any coherent base; it was "clearly not supported by the evidence" and "based only on speculation or guesswork." *Id.* In contrast here, Mr. Blacker's opinion is supported by the evidence.

If PLS believes the precise percentages are overstated, that is an issue for cross-examination: it may ask Dr. Chong and Mr. Blacker about the source of the numbers and argue that the jury should discount using the Dolby Settlement. That is a classic weight issue – not a reason to exclude Mr. Blacker's opinions altogether. *See Summit 6,* 802 F.3d at 1298-99.

- 11 -

**D.**    ████████████████████████████████████████████████████.

PLS's third criticism is that any reference by Mr. Blacker to ███████████████

█████████████ Dkt. No. 83 at 13-15. As an initial matter, PLS mischaracterizes the rule by

selectively truncating the quote from *MCI Commc'ns Servs., Inc. v. Hagan*, 641 F.3d 112, 117 (5th

Cir.). The full quote is as follows: "Litigation does not need to have commenced for Rule 408 to

apply, **but there must be an actual dispute or a difference of opinion**." *Id*. (internal quotations

omitted) (emphasis added). PLS's selective deletion of "but there must be an actual dispute or a

difference of opinion" is misleading. As the correspondence shows, there was no "actual dispute

or a difference of opinion," rather the tone of the correspondence indicated the opposite, there was

no threat of litigation by Intertrust, rather ████████████████████████████

████████████████████████████████████████████████████

████████████████████████ *See*, Dkt. Nos. 83-6, -7, -8, -9. ███████████

████████████████████████    ████████████████████

██████████████████████████████ *See Deere & Co. v. Int'l*

*Harvester Co.*, 710 F.2d 1551, 1556–57 (Fed. Cir. 1983) (finding that the district court erred when

ruling evidence of a pre-litigation offer by the patentee inadmissible because "Rule 408, on its

face, is limited to actual disputes over existing claims and, accordingly, cannot be applicable to an

offer, albeit one ultimately rejected, to license an, as yet, uncontested patent.").

Additionally, misleading is PLS's characterization of ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████." '" Dkt. No. 83 quoting Dkt. No. 83-6. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

- 12 -

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

Moreover, that argument is overbroad and, if accepted, would apply equally to Mr. Dell. Rule 408 bars the use of compromise offers "to prove or disprove the validity or amount of a disputed claim," but it expressly allows such evidence "for another purpose." Fed. R. Evid. 408. Mr. Blacker does not use ██████████████████████████████████████████ ████████████████████ He does not plug the ████████████████████ ██████████████████████████ into his rate or base. Instead, he references ████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████ Dkt. No. 83-1, ¶¶ 61–63, 164. That is a classic "other purpose" under Rule 408(b): ████████████████████████████████ ██████████████████████████████████████████████████████

PLS's own expert, Mr. Dell, recounts the ██████████████████████████. Dkt. No. 93-1, (Dell Rep.) ¶¶ 48-51. Which of course, means that he was informed in some way by the negotiations and considered its impact on his conclusions and report. Although he formally disclaims using the precise settlement dollar figures in his Georgia-Pacific analysis, *see id*. ¶ 48,

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

- 13 -

when done by Mr. Blacker. If there is any Rule 408 concern here, it applies more strongly to Mr. Dell's use ▇▇▇▇▇▇ And it should apply even more so to the AMC/Cinemark Settlement Agreement (equally subject to FRE 408 analysis) used by Mr. Dell to create his entire damage model.

In all events, Rule 408 is an evidentiary rule that governs what the jury may hear, not a *Daubert* rule that forbids experts from considering economic context in forming their opinions. PLS can file a motion in *limine* and the Court can examine the use of the ▇▇▇▇▇▇ ▇▇▇▇▇▇

### E.    PLS's Challenge to Mr. Blacker's Use Of the Sony Agreement and the Christie Proposal Should Be Rejected

First, Mr. Blacker does not ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Dkt. No. 83-1, ¶¶ 156-212 (*Georgia-Pacific* factor analysis). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See id.* ¶¶ 120– 126 (Sony), 286–287 (Christie). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ *See id.* ¶¶ 156-212. ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ *See id.* ¶¶ 227, 287.

Second, using broader portfolio transactions as a "reasonableness check" is permitted. *See Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, In*c., 32 F.4th 1161, 1180–81 (Fed. Cir. 2022) (affirming the lower court's reasonable royalty award noting that the "district court then credited the opinion of Venture's expert that a more likely royalty would be a $2 million lump sum, and it checked that figure against a $1.714 million figure calculated from a prior license

- 14 -

Sunoco granted to the previous owner of its patents, Texon, after buying Texon's blending business."). That is what Mr. Blacker does: ███████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* Dkt. No. 83-1, ¶¶ 227, 286–287.

Third, *Biscotti* is inapposite. In *Biscotti*, the expert used prior licenses as comparables to confirm the reasonable royalty rate range. *Biscotti,* 2017 WL 2607882, at *3. Here, Sony and Christie are not used to set the rate; the NexGuard License is. Dkt. No. 83-1, ¶¶ 156-212.

At most, PLS's disagreement with the weight the jury should give the Sony Agreement and the Christie Proposal reference points is an issue for cross-examination. It is not a basis to strike Mr. Blacker's opinions under Rule 702.

## III. CONCLUSION

Mr. Blacker applies well accepted economic methods, grounded in real world licenses and sales data, to arrive at a reasonable royalty estimate. He uses a directly relevant technology license (the NexGuard License) involving the accused devices, ties his analysis to sales in the damages period, and treats settlement agreements and ███████████ as limited checks rather than as the main engine of his rate. PLS's motion does not identify any serious methodological flaw; it simply prefers Mr. Dell's far more favorable approach for PLS.

Under Rule 702 and Daubert, that is not enough to exclude GDC's damages case. PLS's motion should be denied in its entirety.

Dated: February 10, 2026

*/s/ Paul V. Storm*
Paul V. Storm
State Bar No. 19325350
Email: pvstorm@foley.com
Rachel L. Gillespie
State Bar No. 24144005
Email: rgillespie@foley.com
**Foley & Lardner LLP**
2021 McKinney Ave, Suite 1600
Dallas, TX 75201
Phone: 214.999.3000
Fax: 214.999.4667

Bradley D. Roush (*admitted pro hac vice*)
D.C. Bar No. 1020534
**Foley & Lardner LLP**
3000 K Street NW, Suite 600
Washington, D.C. 20007-5109
Phone: (202) 672-5300
Fax: (202) 672-5399
Email: broush@foley.com

Roland M. Potts (*admitted pro hac vice*)
FL Bar No. 87072
**Foley & Lardner LLP**
2 S. Bicayne Blvd., Suite 1900
Miami, FL 33131-1832
Phone: (305) 482-8400
Fax: (305) 482-8600
Email: rpotts@foley.com

Michelle A. Moran
WI State Bar No. 1073953
**FOLEY & LARDNER LLP**
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Tel.: 414.271.2400
Fax: 414.297.4900
Email: mmoran@foley.com

*Attorneys For Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on February 10, 2026, a copy of the foregoing was served on all counsel of record who consent to electronic service via email.

*/s/ Paul V. Storm*
Paul V. Storm

17